Opinion delivered June 22, 1886.

[No. 5103.]

## J. BENTON *v.* THE STATE.

THEFT—FACT CASE.—See the statement of the case for evidence *held* insufficient to support a conviction for the theft of a yearling, in as much as it fails to establish the ownership in another than the accused, who adduced proof that it was his property.

APPEAL from the District Court of Erath. Tried below before the Hon. T. L. Nugent.

The indictment charged the defendant and one W. J. Ray, jointly, with the theft of one head of cattle, the property of L. White, in Erath county, Texas, on the fifteenth day of July, 1883. The appellant being alone upon trial, was convicted, and his punishment was assessed at a term of five years in the penitentiary.

L. White was the first witness for the State.   He testified that in the summer of 1882, a yellow and white "pided" two year old stray steer came to his place in Erath county, Texas, and remained about the place until July 15, 1883, when the defendant appeared, claimed and took it away.   A month or two prior to the last mentioned date, the witness estrayed the animal before justice of the peace Moore.   A day or two before the defendant got the steer, his co-defendant, W. J. Ray, and Bill Benton, defendant's son, came to witness's house inquiring for the animal.   Witness showed them the animal.   That animal was marked with a cross and a split in the right and a split in the left ear, but was unbranded.   Defendant's mark, or the mark claimed by him, was a cross and two splits in the right and a split and overbit in the left ear.   The brand claimed by him was +E.   Ray and Bill Benton came with defendant to witness's house on the day before the animal was taken away.   Defendant claimed the steer as his.   Witness said: "Mr. Benton, the steer is not in either your mark or brand."   Defendant replied that one of the splits in the right ear must have grown up.   The steer was then roped, and witness made a careful examination of its right ear, but could find no scar or other sign of a second split.   The one split was down the middle of the ear.   Witness then told defendant that there was no sign of a second split in the ear.   Defendant then examined the ear, but failed to find any sign of a second split.   Witness disputed defendant's title to the steer, and defendant again asserted his title, claiming that the second split must have grown up.   Witness declined to surrender the animal until defendant proved his ownership according to law.   On the next day he, his son Bill, and said Ray returned with the affidavits of Ray and Bill Benton, verified before Esquire Moore, to the effect that the animal belonged to defendant, and witness surrendered it.   The steer was taken from witness's possession without his consent.   Neither Ray nor Bill Benton, at any time, in witness's presence, examined the steer's ears.

Cross-examined, the witness testified that when he examined the steer's ears, he found a small nick in the upper part of the left ear, which looked some thing like an over bit, but witness was unable to say whether that nick was made by a dog or by a person in an effort to make a mark.   Witness had never observed that nick until he caught the steer, as related.   He posted the steer as marked with a cross and split in the right and a split in the left ear.   Witness had never heard of a cut in the ear of a

cow or steer growing up. He could not swear that such growth was impossible, but from his experience he regarded it as wholly improbable. Such growth would surely leave a seam or scar. Defendant called witness's attention to the nick on the left ear, and claimed it to be the mark of an over bit. Witness replied that it might be the mark of a dog's teeth.

F. M. Irving testified, for the State, that he knew the defendant, his son, his co-defendant, W. J. Ray, J. C. Ray, W. J.'s brother, a witness in this case, and the witnesses Bud Wilson and Jackson Phillips. In the year 1881, the witness and all the parties named, including the prosecuting witness, L. White, lived in the same neighborhood. Witness knew the animal involved in this prosecution. It came up with the witness's cattle in the spring of 1881, and was then an unmarked and unbranded yearling bull. On the eighth day of April, 1881, the witness for the first time observed that the animal had been marked and altered, and the brush of its tail cut off. It had, when the witness saw it on the said April 8, been but recently (a few hours) marked and castrated, the blood still flowing from its ears. It was then about one and a half miles from the defendant's house, its general course tending from the defendant's house. Witness did not know who marked and altered it. The animal, while it ran with witness's cattle, was considered an estray by all who knew it. It disappeared from the witness's range in the fall of 1881, and witness did not see it again until during July, 1883, when he saw it in the defendant's range, with defendant's brand on it. The summer of 1881 was a very dry one, and the only water accessible to witness's range was in a hole near the defendant's cow pen, at which hole the witness's cattle watered while the stray yearling ran with them. When the witness found that the animal had been marked and altered he, knowing it to be an estray, carefully examined its ears to ascertain the mark in which it had been put. The mark was a crop and one split in the right and a single split in the left ear. The single split was immediately in the center of the ear, where it was usual with cattle men to put single splits. Witness saw the animal after it was taken by defendant from White, but did not examine the ear to see if a split had grown up.

Cross-examined, the witness said that the feelings entertained by him towards the defendant were not, at one time, of the most friendly character. He and defendant had some trouble about some land, and defendant made some remarks about witness in

connection with this case. Witness was not now on friendly terms with defendant, but had no ill feeling towards him. Witness observed the animal closely when he saw that it had been marked and altered, because he thought then that the defendant was trying to "get away with it." Witness was a merchant, and the post master of Sparta village. His feelings towards the defendant were not such as would influence him to injure defendant by his testimony.

Jackson Phillips testified, for the State, that he lived about a quarter of a mile from the defendant's house, and lived there in 1881. He knew the steer in controversy. It came into the neighborhood early in the spring of 1881, an unmarked and unbranded bull yearling. Witness saw it late during that spring, when it had been castrated, its tail swabbed, and its ears marked, as described by the witnesses White and Irving. One day, before the animal was marked and castrated, witness met defendant and Tige Littlefield, and described the animal to them, and asked who owned it. One of them, witness thought the defendant, replied that he did not know. They refused to go with witness to examine it. The animal was recognized as an estray in the neighborhood, which it left in the fall of 1881.

Cross-examined, witness stated that he was unable to say positively whether it was Littlefield or the defendant who said that he did not know who owned the yearling, but it was his impression that it was the defendant. Witness had frequently heard the animal involved in this trial called the "Roberts yearling," after Frank Roberts, now deceased. It was not considered the property of said Roberts, but was always regarded as an estray. Witness and defendant were on good terms.

Bud Wilson testified, for the State, that he first saw the yearling involved in this case shortly after it was marked and castrated, as described by previous witnesses. It was then a noted animal, and regarded generally as an estray. Witness saw it again on the defendant's range, after the defendant got it from White.

Cross-examined, witness testified that, in the spring of 1881, after the animal was marked, he heard it frequently called the Roberts yearling or maverick. Witness heard of defendant letting Roberts have a yearling to pay a debt due by Roberts to Cunningham & White, but had no personal knowledge of such fact; nor did he know whether or not this was the yearling so furnished Roberts by the defendant. The animal, even while it

was sometimes called the Roberts yearling, was considered by the general public as an estray, and not as Roberts's property.

J. C. Ray testified, for the State, that he was the brother of W. J. Ray, jointly indicted with the defendant for the theft of the animal described in the indictment. He was acquainted with the defendant, near whose house he lived in 1881. Witness saw the yearling involved in this case when, in the spring of 1881, it came into the neighborhood, an unmarked and unbranded bull yearling. It was regarded generally as an estray. Witness saw it again after it was marked and altered, as described by previous witnesses. Witness knew Frank Roberts in his life time. Roberts was a nephew of John Steen, an absent witness in this case. A short time after Steen went before the grand jury to testify about the theft of this yearling, the witness had a conversation with the defendant, in the course of which defendant asked witness to see Steen and tell him that he had better hush up about the steer matter, unless he wanted to bring disgrace upon his sister and his dead nephew,—his sister being the mother of Frank Roberts, deceased. Defendant was not related to Steen, Roberts, deceased, nor Mrs. Roberts. Witness had a second conversation with defendant after the indictment was found. He told witness in that conversation to write to his brother, W. J. Ray, and tell him not to return to Erath county until the result of his, defendant's, trial was known. Witness wrote to his brother as advised by the defendant. He advised his brother to leave soon after he was accused of, but before he was indicted for this offense. Witness's brother had been in defendant's employ but a short time when this theft was charged to have been committed, and knew but little of defendant's cattle.

Cross-examined, witness stated that, though the yearling was sometimes called the Roberts yearling, it was generally regarded as an estray. Witness's unkind feeling for the defendant resulted from the defendant's treatment of him in a land transaction, his, defendant's, talk about him in regard to this case, and his agency in getting witness's brother into this "scrape," together with the treatment the witness received from the hands of defendant's sons.

Re-examined, the witness testified that the defendant's sons, or one of them, and another man, attempted to rob and kill the witness about one and a half years before this trial. Witness's brother, W. J. Ray, was about twenty-one years of age when he proved the yearling for defendant. It was the defendant's son,

Tom Benton, now serving a term in the penitentiary, who attempted to rob and kill the witness. Witness's feelings would not influence him to bear false testimony against the defendant.

The State next introduced in evidence the affidavit of W. J. Ray, upon which the animal was recovered by defendant from White. The affidavit recites the ear marks of the animal as a crop and split in the right ear and a split in the left.

Dan Rogers, Ira Milliken, Jack Riddle, W. W. Cain, and several others testified, for the State, that they were experienced stockmen, and had never known a split in the ear of a beef, cow, or other neat cattle, to grow up. If such growth was possible, it was, nevertheless, improbable. The State rested.

Bill Benton, the defendant's son, was his first witness. He testified that he knew the animal involved in this prosecution, and knew it to be the property of the defendant, and to have been raised by him. The said animal strayed off early in the spring of 1881. Witness marked and altered the animal in the defendant's cow lot in the spring of 1881,—during the month of April, according to his best recollection. It was then past a year old. Witness's father, the defendant, his brother Tom, John Bradford, and perhaps others were present when witness marked and altered the animal. The witness put it in the mark of his father—a crop and two splits in the right and an overbit and one split in the left ear. Witness turned it out on the range in the summer of 1881, whence it disappeared, and witness heard of it no more until in the summer of 1882, when Dan Crossland reported that he saw it on Buck creek, and attempted to drive it, but it escaped through some brush. Shortly afterwards the witness saw it on the prairie, but left it, as he was then going from home. In July, 1883, witness was informed that L. White had posted one of his father's steers, and he and W. J. Ray went to see about it. White was found in his field, and witness told him that he had come to see his father's steer which he, White, had posted. White replied that he had two steers posted, and asked witness to describe his father's animal. Witness described the animal, and White said that the flesh marks corresponded, but that the marks did not. Witness told White that his father's steer was not branded. Witness, Ray and White then went to look at the steer. They found it in the woods, about one and a half miles distant from White's house. From a point about fifty yards distant the witness pointed out the steer, but White again said that the marks would not correspond with witness's father's

mark. The witness replied that he had marked the animal in his father's mark, and then he went home and told his father he had found the steer. A few days thereafter, defendant, witness, and Ray went to White's to get the steer. They drove the steer up, roped it, and examined its ear marks. There was but one split in the right ear, but a plain scar showed where a second one had grown up. The scar was difficult to find, but when found was perfectly plain. There was a plain over bit in the left ear. White claimed that the over bit in the left ear was such a mark as the teeth of a dog might have made, and refused to surrender the animal unless it was proved according to law. He, White, refused to examine the scar. Witness, Ray and defendant then went to Esquire Moore to prove up the animal. Mr. Moore, to whom all the parties were strangers, required a certificate of credibility before he would issue process for the animal on an affidavit. The party then returned home, and Ray went to Esquire Butler and got a certificate of credibility, with which Ray and defendant, a few days later, went to Moore, made the necessary proof, and secured the necessary papers, upon which White surrendered the yearling. The animal was then put in defendant's brand and turned into the field. It was finally butchered and sold. In 1881 Frank Roberts got a steer from defendant to pay a debt to Cunningham & White, which the witness understood to be the steer involved in this trial.

Cross-examined, witness stated that no other animals were marked at the time that this yearling was marked and altered. It was not marked and altered at the spring marking of defendant's calves, because it had escaped from the field in which the said calves were kept. It was not branded when it was marked and altered, for the reason that the morning was too damp to build a fire to heat the branding iron. As a matter of fact, the witness could not remember why it was not branded on that morning. Witness did not know who swabbed the yearling's tail. He could not remember that the tail was swabbed when the animal was marked and altered, but knew that he was not in the habit of swabbing the tails of animals that he marked. The witness knew the animal well, and saw it on the range as late as the fall of 1881. Witness said on his examination in chief that the yearling disappeared in the summer of 1881, but would say now that it disappeared in the fall of 1881. When witness and Ray first went to White's house, White did not ask witness his father's mark and brand. Witness, Ray, and White,

were not on their way to find the steer when the witness for the first time told White that one of the steers his father had lost was unbranded. White did not tell the witness that the animal was unbranded before witness told him that his father's missing animal was unbranded. Witness first told White that one of the splits in the right ear must have grown up, after they reached the animal. Witness, at White's house, where he, Ray, and defendant went after the steer, took the animal's right ear in his hand, turned it wrong side out, and discovered the scar left by the growing up of one of the splits. White did not examine the ear. Witness did not make the affidavit of ownership of the steer. Ray had been in the defendant's employ about five months when he made the affidavit of ownership for defendant, but had been in the neighborhood over a year, and knew defendant's stock well. Witness and Ray took a trip off together in the winter of 1882–1883, hunting work. The witness did not, in the summer of 1881, go with his brother to the pen of F. M. Irving, look at the yearling defendant got from White, and say that it was not his father's, and that his father did not own an animal in any wise similar to it. He did not look at a spotted yearling, branded with a heart, in Irving's pen, and say that it did not belong to defendant. Irving did not then have in his pen the yearling involved in this trial.

Ada Benton, defendant's daughter, testified, in his behalf, that the animal described in the indictment was born in the summer of 1880, of a cow which was given to the witness by her uncle. Witness's brother William marked it in the spring of 1881, when it was past a year old. Defendant, witness's brother Tom, and John Bradford, were present when the animal was marked. This animal was not branded with the other calves, because it was not up at that time. The animal then belonged to the witness, but was subject to the defendant's use or sale. The same animal was recovered from Mr. White, but had then been traded by witness's father. Witness owned several head of young stock, all in her father's mark and brand.

Cross-examined, the witness testified that she was not present when the animal was marked and altered, and had no personal knowledge of the fact that it was marked and altered. She knew nothing about the tail being swabbed. It was not swabbed when witness saw it. Witness knew the animal well, and knew that the animal which issued from the cow given her by her uncle, and the animal recovered by her father from White, were

one and the same. The animal disappeared in 1882, and witness saw no more of it until it was recovered from White. Witness traded it to defendant in 1882. Up to that time neither the defendant nor other person had witness's consent to use or dispose of the animal.

Mrs. Benton, the defendant's wife, testified, in his behalf, that the animal described in the indictment was the calf of a cow given her daughter Ada by her uncle, and was raised by the defendant. This animal was not marked and branded with the other young animals in the spring of 1881, because it had escaped from the field and was then at large. It was about the place frequently, but for some reason was not marked until late in the spring. It was then turned out upon the range, from which, after a time, it disappeared, and was not seen again by the witness until some time in the fall of 1882. During that fall the witness, being grape hunting, saw it between two and three miles from home, with some cattle owned by Mr. White and Martin Hart. Witness knew it at once. The defendant afterwards, in the summer of 1883, brought the same animal home from L. White's place, and branded it, and soon afterwards killed it and sold the beef. Defendant, in 1881, let Frank Roberts have this animal to pay a bill he owed White & Cunningham for merchandise. Roberts transferred the yearling by bill of sale, but afterwards defendant substituted a cow, and got back the bill of sale.

Cross-examined, the witness said that she was absolutely sure that this animal was the same one defendant let Roberts have to pay the White & Cunningham debt, which defendant afterwards got back, by substituting a cow. Witness did not tell her husband about seeing the yearling in the fall of 1882.

John Bradford testified, for the defense, that in April, 1881, he saw William Benton, in the defendant's cow pen, mark and alter a bull yearling which corresponded in flesh marks with the animal described in the indictment. Witness did not know that he had ever seen that animal since, but in the fall of 1883 he saw a three year old steer in defendant's field, in the defendant's brand, which he thought was the same.

Cross-examined, witness said that it was not raining, nor was it damp on the morning when the yearling was marked and altered. He did not remember whether or not the animal's tail was cut off at that time.

Dan Crossland testified, for the defense, that he was somewhat familiar with the defendant's stock. Witness and Bill Benton

were hunting stock together on Buck creek in the spring of 1882. They got separated, and during that separation witness found a two year old steer which he thought he recognized as belonging to defendant. He tried to drive that animal, but it escaped. It was, the witness thought, the same animal which he saw a year later in defendant's field, in the defendant's brand; and its flesh marks corresponded with those of the animal referred to in this indictment. He told Bill Benton about seeing the animal on Buck creek.

J. L. Cunningham testified, for the defense, that in 1881 he represented the firm of White & Cnningham in the sale of merchandise at Sparta, Texas. A. F. Roberts got in debt to the firm, and paid the debt with a bill of sale of a yearling, which yearling was to be delivered in August. Witness never saw that yearling, but did not think the bill of sale described it by flesh marks. Witness understood that that yearling was the one for the theft of which this defendant is now prosecuted. Witness went, in August, 1881, to get the yearling, and hunted it with Bill Benton, but failed to find it. Defendant gave a cow in its place, and took up the bill of sale.

Cross-examined, the witness testified that the bill of sale was in the hands of the defendant or his attorneys. It was his recollection that the defendant was indicted before he substituted the cow for the yearling and took up Robert's bill of sale.

Several witnesses, shown to be experienced stock men, testified, for the defense, that they had known instances of splits in the ears of neat cattle growing up. In each case the scar was discoverable on close inspection.

G. W. Jones, the purchaser of the carcass of the yearling after its slaughter, and John Dillard, one of his employes, who was with him at the purchase, testified, for the defense, that the right ear of the steer, after its death, showed plainly one split and also the scar of a split that had grown up. The defense closed.

L. White, recalled, testified, for the State, in rebuttal, that when Ray and Bill Benton first came to see him about the yearling, he asked the latter what his father's marks and brand was. Bill Benton replied that his brand was +E, and his mark a crop and two splits in the right and an overbit and split in the left ear. Thereupon witness told him that he did not have his father's steer posted; that the steer he had posted was not branded at all, and was not in his father's mark. Witness went with Bill

Benton and Ray, and called the former's attention to the fact that the right ear of the animal contained but one split. Bill Benton remarked that one of the splits must have grown up. Ray had nothing to say about the steer on this occasion. Neither Ray nor Bill Benton spoke of nor about the steer when defendant came with them on the next day. Bill Benton did not examine the steer's ear on the occasion. Only witness and defendant examined it.

F. M. Irving testified, for the State, in rebuttal, that in the summer of 1881 he had the animal referred to in the indictment in his pen, and sent for defendant to come and see if he owned the animal. Bill and Tom Benton came and examined the animal thoroughly, and said positively that they owned no such animal. Witness never had in his pen such an animal as that described by Bill Benton as being branded with a heart, at a time when Bill and Tom Benton came to his pens.

The motion for new trial raised the questions discussed in the opinion.

*Frank & Devine* and *Lee Young*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. To sustain this conviction it is essential that there should be proof, clear and certain, that the alleged stolen animal was the property of some other person than the defendant, at the time it was taken by him. The evidence before us fails to show this important fact with that degree of certainty which the law demands. On the contrary, there is very positive testimony that the animal belonged to the defendant at the time he took it, and at the time it was regarded as an estray, and was estrayed by White.

By direct testimony the defendant proved that the animal was the offspring of a cow which belonged to his daughter, and that he had traded with his daughter for said animal before the same was taken by him; that said animal was marked in his mark while it was a calf, and remained on his place, and with his cattle, until it was about one year old, when it disappeared, and was not again seen by him until he found it in the possession of White, when it was about three years old.

We are of the opinion that the evidence does not support the conviction. If the defendant is in fact guilty of the theft it is

better that he should escape punishment than that he should be punished upon uncertain and insufficient proof.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*